Good morning. Good morning, Your Honor. May it please the Court, Winslow Taub on behalf of appellants and plaintiffs in this case, Peter Reagan and Leesa Jacobson. Your Honor, this case concerns a fundamental First Amendment right recently reaffirmed by this Court in Reed v. Learance, namely the First Amendment protected right of observing a government operation. The government operation plaintiffs in this case seek to observe is the activity of Border Patrol agents acting under the limited authority granted to them by U.S.D. Martinez-Fuerte to conduct brief questioning of motorists without any reasonable suspicion. Could I stop you for a moment just to help me with the physical layout? There was a very small diagram and I didn't have a magnifying glass and having read through everything thoroughly, I still can't visualize it. So could you help me understand what did it look like when the Border Patrol was first operating and then where did the rope lines go? Yes, Your Honor. So when the Border Patrol was first operating the checkpoint and I can't speak to the historical evolution of everything that's there, but certainly at the time when activity relevant to this case began, there were a number of traffic signs surrounding the checkpoint and on the approach to the checkpoint from either side. It's going east-west and they've really only checking east, is that correct? That's correct, Your Honor. And then they had signs on the eastern road going up, I mean, the east going west road. They had signs and bumps and then when you got to where the Border Patrol officers were, what was there? So, Your Honor, there are some temporary buildings on the south side of the road and other equipment. There's a place right at the center of the area in dispute where vehicles are actually stopped to conduct the questioning authorized by Martinez-Fuerte, again, without reasonable suspicion. Then what's on the sides of the road? So there's barbed wire on either side of the road or what's on the sides? So on the side of the road, on both the north and the south side, there is a portion of the public right-of-way, which is unpaved, but again, it's public land and there are properties, private properties  both on the north and south sides of the road. So the barbed wire demarcates where the difference between the county property and the private property. That's correct, Your Honor. And then when they put in, after the protests, when they put up ropes, where were the ropes put? So, Your Honor, the ropes were put and I think that, I apologize for the smallness of the diagrams, probably the- Note for the future, you know, when you're dealing with judges my age, like a larger diagram is better. Indeed, Your Honor, and actually would be happy to submit a blow-up after the fact, but if you look in the reply brief, and this is at page four, this is in figure one, is a blow-up of a portion of the area surrounding the checkpoint. The red rectangles in figure one illustrate where the rope barriers were erected in response to plaintiffs' attempt to monitor the checkpoint activity. So you've got the signs, the bumps, the temporary vehicles or the temporary buildings,  I mean, east on the road, or were they going further north and south? Where were the ropes put up? So, just to clarify, there were no ropes at all on either the east or west side of the checkpoint area prior to plaintiffs' attempt to exercise this right. The ropes were not erected. The first things that were put up were actually just police tape, and that was put up on the east side, 150 feet away from the center of the checkpoint where vehicles are stopped for that questioning. Was it cutting off the sides of the road, or was it, it wasn't on the road itself, it was cutting off the sides of the road on both the north and south sides? Correct, Your Honor. It's cutting off the side of the road, the portion of the right-of-way, which is for pedestrians, for example. So like from the barbed wire to the road, but 150 feet away from where they were actually doing the checking. That's exactly right, Your Honor. And then subsequently, the yellow police tape was replaced with rope barriers, both on the east and west sides of the checkpoint area, equidistant on both sides, 150 feet away. And that's for a total area of, what, some 300 and some feet, or closer to 400 feet? It's a football field, roughly, Your Honor. It's 300 feet, that's right. Football field's actually 300 yards. No, I just wanted to focus for a second on... I'm sorry, it's only 100 yards, you're right, you're right. Thank you, Your Honor. I was wrong, you're right. I wanted to focus for a moment on what changed to make this something other than a public forum. And it's part of the same issues my colleagues have raised. And I want to be sure I'm correct on this. As I understand it, there was no physical change on the north side of the roadway, other than the addition of two street signs and a portable lighting unit. Is that correct on the north? On this record, that's correct, Your Honor. And of course, the rope barrier, which was erected in response to police. Right, and I might get to the south side here. The south side, as I understand it, contains a portable office, a portable kennel, and portable restroom. But none of those are within the enforcement zone, except the street signs, is that right? Your Honor, what the government first defined as the enforcement zone, and this is a historical artifact. The first sign put up on the rope barrier designated this area as an enforcement zone. So that was done after the protests? Correct, Your Honor. Okay, so before the protests, what Judge Smith was describing was the footprint of their checkpoint area. There was a few vehicles or buildings on the south side, and that was where the secondary inspection was, correct? Your Honor, so a couple of things. Yes, the area used for secondary inspections, and again, this is where vehicles are diverted if something comes up in the routine questioning permitted by Martinez-Forte. That area is on the south side of the roadway, and it's visible, if you look carefully, at figure one in the reply brief. It's the area, there's actually a scale that's visible as a sort of black and white checkerboard. The area directly above that on the south side of the roadway is the area that is used for secondary inspection. What I'm trying to focus on is what changed this, from the government's perspective, from a public forum to a non-public forum. That's why I'm focusing on what changed physically. Your Honor, the only change that was made physically at the point where the government contends is the division between public and non-public forum is the erection of the road barriers. And that really is the central and most troubling issue in this case, is that the definition and the alleged boundary between public and non-public, according to the government's theory of the case, is precisely the obstacle that they erected in response to expressive activity. Let me ask you this about, so we've got the road, the Supreme Court has said that roads are from time immemorial public forums, though I don't know why you'd be walking down a road with the cars going by, but the size of the road, so there's like 15 feet up to the barbed wire, is county property, and what's, is there evidence in the record, or what is the evidence that that's a public forum? I mean, it could be public property, but the Supreme Court hasn't said the shoulders of a road are a public forum. Yes, Your Honor, well, two responses to that. One, a set of precedent cases considering similar roads, and two facts on the record indicating that this roadway, like other roads, is used for expressive purposes. I'll actually start with the latter. Including the shoulders. So I'm really focusing on the shoulders, because one of the pictures in the record shows the rope, no unauthorized entry beyond this point, but what it's roping off is like, there's brush and there's some dead trees, and it doesn't look like a park or a sidewalk or anything like that. That's correct, Your Honor. And again, it's private property. There are evidence in the record, and there are some photographs of, for example, signs placed on property adjacent to this roadway in the vicinity of the checkpoint making statements about either opposition to or support for the checkpoint. And you had some of those, I think, in the record, saying, you know, stay, Border Patrol, stay. We love the Border Patrol, or something like that. That's exactly right, Your Honor, and I'm happy to provide the specific sites. But were people, was it an area like a public park? Was it, had the county made it available? I mean, the fact that some people have put up signs doesn't mean the county had made it available as a public forum. So I'm just, I want to make sure I understand why, what the basis is for saying that this shoulder area was a public forum. So again, as a legal matter, Your Honor, we begin with the presumption that the road is a public forum, and it's not. But the road, not the shoulders. And the right-of-way, yes, Your Honor. And there are cases, for example, there's a Third Circuit case considering a right-of-way between a gas station and a road, and considering that to be, you know, again, part of the public forum. The county permit, again, that the government submits in support of its case, designates the area as a public road and includes the right-of-way within. I looked at the permit, and it didn't have like any meets and bounds description. So it doesn't really tell you what area was being granted by the permit. So the county owns a right-of-way, apparently, and then authorized the Border Patrol to use it for checkpoint purposes. But I didn't see any description of physical area. Is that correct? That's correct, Your Honor. And so the, again, the supremacy clause, you know, probably means that the permit wasn't necessarily required for the government to conduct law enforcement operations on the road. The permit does not specify a particular place on Aravaca Road where the checkpoint is to be set up. There are, of course, regulations, and there are legal restrictions on the mobility of those checkpoints and the fact that they have to be set in advance. And so the disputed area is the place where the government decided to establish a checkpoint. So I didn't understand your brief, and maybe you can correct me, to say that the original footprint of the checkpoint, so where they were stopping cars, inspecting them, putting them off to the side, continued to be a public forum. Am I reading that correctly, that that had been withdrawn for these specific law enforcement checkpoint purposes? Your Honor, I don't think it's possible to say on this record definitively that a portion of that space or particular portions have been withdrawn from public use. And the- You're not seeking access to all the entire area, are you? No, Your Honor. But again, the limiting principle on which we're not seeking access to certain areas is the standard that's been repeatedly applied in cases where observation of law enforcement is what's requested. And that's, you should be able to stand where you're not interfering with those law enforcement operations. And in cases like Glick, for example, that is the test that the court uses in evaluating whether it would be proper to exclude the plaintiffs from a particular area. Are you taking the position then, so I must have misunderstood in the briefing, that the entire area where the, even the original area, before they roped off additional areas, even the original area where they were doing their checkpoint activities is a public forum? Is that your position? I think at this point on the record, our position is that we couldn't conclude, a fact finder, for example, couldn't conclude definitively that portions of that, that specific portions are no longer a public forum. I think there are certainly facts in the record that would allow the fact finder to deduce that certain areas are used for law enforcement operations. And the court in evaluating where it would be reasonable to sort of restrict plaintiffs from accessing could take that into consideration. So you're saying theoretically some portion, you don't dispute that some portion of where the Border Patrol is implementing their checkpoint activities is a non-public forum. You just don't know the size of that footprint. Is that, do I have that right? That's correct, Your Honor. Certainly on a fully developed record, it could be possible to conclude that portions of the area around that place where vehicles are stopped are a non-public forum, but I don't think we have the facts on the record yet. If I understand your position correctly, this is a material issue of disputed fact. Yes, Your Honor. There has been no determination by the district court of what portion, if any, of this area is either a public forum or a non-public forum. You need to answer that first before you go on to the other questions because there's a lot of controls that you can put on in a non-public forum that are not possible in a public forum. Your Honor, absolutely, Your Honor. That's one of two very important threshold questions as to which there are fact issues. The other, of course, is on the issue of viewpoint discrimination. And even on the existing record, the inference that a fact finder could draw and at the summary judgment stage, the court is required to draw in the favor of the non-moving party is that this restriction of access directed at plaintiffs was done for purposes of viewpoint discrimination. And I'm just going to highlight a couple of aspects of that. The first, of course, is the timing of the erection of the barrier. Again, these barriers are not in the traffic control plan, which the government has submitted only in very redacted form. That's A. And that's the classic, there's a cautionary note sounded in many First Amendment cases about restrictions and regulations that are created after the exclusionary context because of the risk of sort of post hoc justification. The record here goes beyond that. There are two very critical places in the record where there are direct statements, A, about the discretionary nature of the exclusion. And this is at ER 069. This is from defendant San Martin, that say agents have the authority to determine who can enter into the perimeter. That's in the record. And the second is the statement by border patrol agents to the surveyor where they stated directly that the barriers are only in place to exclude people such as protestors who might interfere with border patrol activities. So that protestors is viewpoint neutral, right? Because you could have people who are protesting immigration policy, letting too many immigrants in, and they would also be interfering with the activity. The thing I was concerned about that the evidence of viewpoint discrimination that you said created a genuine issue was that the surveyor who was an agent of the protestors was allowed in to view it. And an individual who was anti-protestors was allowed in. And what was excluded was groups of people that the border patrol said was interfering with their activities. So it was hard for me to see where there was strong evidence of or a genuine issue, material fact, a disputed issue that would support that of viewpoint discrimination. Two reasons, Your Honor, and it's an important distinction. The point in time when there were individuals who were pro-checkpoint allowed in the area for 40 minutes or so was not during any of the incidents where there was a large number of monitors at the checkpoint. This was later where the number of monitors at the checkpoint was very small and there's absolutely comparability in terms of the number of people allowed in versus allowed out. I thought there was just one individual who was allowed in. And his wife, Your Honor. So there were two individuals. And there were two people who were monitoring it who were required to stay out. I didn't see that. It's not in the record, the precise number, but this was not on one of the days when there was an identified protest, for example, where there were more than a handful of people present. So I understand you didn't have the opportunity to do discovery. So I'm wondering if that's a better argument. Because there didn't, as you just said, it wasn't in the record that there were only two people or some three people being excluded. There's only one. I think even on the record, Your Honor, though, given that there's absence of any indication that the decision there was made based on number of people, a fact finder could certainly draw the inference of viewpoint discrimination. That's point one. Point two, there's another instance in the record. This is when reporters came to the checkpoint and were allowed in on the very same day that the monitors were kept outside the barrier. And this is exactly the fact pattern that this court recently considered in Reed v. Lawrence, where someone seeking to observe the Buffalo Drive was excluded from an area and later the same day other members of the public were let in. What's the best place for me to look at where the reporters were included and the protesters were excluded? Year 216, Your Honor, is where that's discussed. Thank you.  And I have three minutes remaining. I would like to reserve a little time for rebuttal, provided that I'm permitted to do so. Thank you, Your Honor. Good morning, Your Honor. Good morning. I may have pleased the court, Patrick Nemeroff, on behalf of the government. If I may, I'd like to start with the history of the checkpoint and the physical layout of the checkpoint, because the court certainly seemed focused on that issue. So the Border Patrol established the Aravaca Checkpoint in 2007. So the permit you got from the county was very vague. It didn't specify any particular location. It didn't specify the location or size of the facility. That's true. There is a diagram attached to the back of the permit that has, you know, certainly not detailed, but a vague description of what the checkpoint will look like. And the permit also provides that the layout of the checkpoint has to be approved by county officials to ensure that it will be safe for the traveling public. But the checkpoint's layout wasn't determined, you know, solely by that permit. It was determined by Border Patrol policy and by the National Traffic Plan that was implemented following a pair of fatal traffic accidents at a checkpoint. And in 2007, the checkpoint, well, let me, just to jump ahead, the only change that occurred after the plaintiffs here sought to enter the checkpoint was the hanging of those ropes. And the hanging of the ropes was, if you look at the record at, you know, page 167 or page 179 are two photographs that I think show where the ropes are. You'll see they're at the edge of the checkpoint as it was already established. So it was, so it's where the signs and the bumps start, but it's not where the actual people are located to actually look at the cars. Is that right? That's right. But I think that, you know, before... They say that there's no other checkpoint that has this configuration. That was true at the time that the record was compiled in this case, but it's also true that nobody had sought to congregate in the center of a checkpoint. So the problem hadn't arisen. So our position is that, you know, Border Patrol established a checkpoint in 2007. It wasn't seeking to establish a non-public forum. It was seeking to establish a checkpoint, but at the moment that it did so, it became a non-public forum in 2007. That's what I was going to ask you. In 2007, when this was established, is it the position of the government that that roadway, by definition, became a non-public forum? Exactly. At that point, the government genuinely altered the nature of that public property such that it would no longer... It meets both prongs of the test. First, what's the purpose of the property? Is it a purpose that's consistent with expressive activity? No, the purpose of this property is to serve border security. The two cases, the two principal cases that I think you rely on that found roadways to be non-public forums are Greer v. Spock and Hale v. Department of Energy in the Ninth Circuit. But both those cases, the entire road was off-limits. It wasn't a public roadway any longer. In a military base or an access road dealing with some energy, nuclear facilities, those roads were not public forums because they and the immediate surrounding areas had been withdrawn from public use and weren't open to the public in an unrestricted way. But that's not true here. Here, it's still a public roadway in the sense that traffic goes along the road. Respectfully, Your Honor, I disagree with your characterization of the facts in both Greer and Hale. And in particular, Greer, what you had was a 55-square-mile military reservation with county and state roads and sidewalks that pass through it. And the decision explicitly states that members of the public were allowed freely to travel through it. And it's not as if there was a gate that they had to pass through. People use those roads just as they use this road to get from one destination to another. There were parking lots. There were huge areas that weren't used by the military on a daily basis that people presumably could congregate in. And yet, the court had no trouble finding that the entire military reservation was a non-public forum. Here, we don't have a 55-square-mile area. We have a 400-foot stretch of a road that has been marked since 2007, clearly, with lane barriers, equipment on both sides of the road, traffic cones, rumble sticks, and signs stretching out on either side of the checkpoint. So if you were to set up a tent and some barbed wire and even have a guard outside of a courthouse, say a state courthouse, and as people left the courthouse, they had to pass through there, and you could interview them, take them off, whatever, would you say that your establishment of that tent and the barbed wire, whatever you used, would automatically create a non-public forum in that setting? I mean, I hesitate to use the word automatically because this always depends on the context of the situation. But if the government legitimately sets aside an area for some security function, it clearly delineates that area so that the public recognizes, when I pass this line, I'm entering an area that's not devoted to expressive activity. Then, yes, it becomes a non-public forum. Well, basically, it sounds like you're saying that no matter what the government does, whether it's putting a policeman there or a shack or whatever to do that, automatically, it's a non-public forum. Can you bar people from observing that? Yes. Yeah, so let me. That's kind of shocking. Well, there are two questions I think your honor is asking, so let me just address both of them. On the first one, whether it becomes a non-public forum, no matter the situation, you have to apply the test. So is the purpose of the area now consistent with expressive behavior, and is it clear to the public? If it's not, is it clear to the public that this is a different area? So here, with the checkpoint, that's satisfied. Now, on the observation question, there are cases, including this court's decision in Fordyce, recognizing a right to observe officers in public areas. For example, I had a case involving wild horses, and the BLM didn't want anybody around. They thought that was embarrassing. And you had a photographer that wanted to take pictures of what was happening to these horses, and they said, oh, you can't do it. It's a safety issue, whatever. And we found, you can't stop that. They have a right to observe. You have a right to implement your policy. But what troubles me about this is that it seems like you're saying that if the government sits down and flops some whatever and stops a few cars, that suddenly people can't observe. They can't get anywhere within an observable distance. And that's not this country. We have an ability and a right to observe what police do, right? Well, a couple of points. First on the law, the decision your Honor is referring to, Lee v. Salazar, involved the right of access test. And the right of access test is a two-pronged test that plaintiffs didn't endeavor to satisfy whatsoever in this case. And in fact, in district court, plaintiffs expressly stated that Lee v. Salazar on the right of access test was inapplicable to this case. So if you look at both their preliminary injunction briefing, they go on at some length that that's not the test that should be applied in this case. And then in their opposition to the government's motion for summary judgment, I believe it's a footnote 12, they again say Lee v. Salazar is not the correct test. And I think there's a reason. Let's say that's correct. What is the government prepared to do to give the public the right to observe what's going on? Well, and that goes to, I mean, the right of access cases are concerned with situations in which the public legitimately has a First Amendment right to observe certain proceedings, for example, criminal trials. There's no question about that here, is there? Right. No, there certainly is a question, Your Honor. I think there's a reason the plaintiffs didn't make that argument, because the Supreme Court has made very clear that the First Amendment doesn't entitle the public to any information within government control. And under the right of access test, what the court looks to is, first, is there a tradition of the public observing the sort of proceeding that the individual wants to observe? So like stopping an automobile, is that a secret? No, Your Honor. And if it were in a public forum and the individual were legitimately at a location, then there is some case law to support the idea that the police couldn't stop that person from filming just for the sole purpose of filming. But all of those cases have also said that there can be, even in a public forum, reasonable time, place, and manner restrictions on the observation of officers performing their functions. And so, for example, in ACLU v. Alvarez, the Seventh Circuit decision, which plaintiffs rely on heavily, the court said, it goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes, and protect the integrity and confidentiality of investigations. So even in those cases, in public fora, not a checkpoint, which is a different situation, the courts have recognized that there can be a perimeter established that would limit people's ability to observe in some respect. Can I ask you a slightly different question? And this is about assuming the opposing counsel agrees that some portion of that area might be a non-public forum. The question is, how broad? And the suggestion is that there's a disputed issue on that. And your argument, as I understood it, was, well, the ropes just went out on the area that was already demarcated as being a checkpoint. But I'd like to ask you how far that goes. In other words, if the Border Patrol decided that they actually needed more security than the Athens of 150 feet, it was 200 feet or 300 feet, I assume it's not your position that the Border Patrol could just decide on their own where the limits was of their area, and that that would then automatically, as Judge Smith says, become a non-public forum. So help me understand why there is this disputed issue here. You're right, Your Honor. We're not arguing that the Border Patrol could just set the ropes out as far as they want. So there's two points, a factual and a legal point. Here, they certainly didn't arbitrarily choose a place to hang the ropes. They hung the ropes at the edge of a checkpoint that had been in the exact same location for almost 10 years, so since 2007. So it wasn't some arbitrary decision. But more importantly, if you look at the case law, whether- It wouldn't have been arbitrary if they chose to hang the ropes 4 tenths of a mile away where the first signs start advertising the checkpoint. That wouldn't have been arbitrary. It would have been a point that's been demarcated by- It also would have been significantly harder to defend. And I don't think we'd be able to make the same argument that even before the ropes were hung, a member of the public traveling down the road would know as soon as they're within where those lane dividers are and the rumble sticks, they know they're not in your typical sort of public forum street. Well, it sounds like you're recognizing that this has to be narrowly tailored. And my question to you is, was that ever dealt with in the district court? In other words, isn't that a material issue of disputed fact? We're not conceding that it has to be narrowly tailored, Your Honor. And to my second point about the law- Do you not agree that it has to be narrowly tailored? No. And if you look at either under the forum analysis or under a reasonable time, place, and manner restriction analysis, either way you look at it, courts have never micromanaged the government in terms of where they put these sorts of limits. So if you look at forum analysis, we have Greer, where, again, there was a 55-square-mile military reservation. We have Hale, where there was a three-mile stretch of road. We have Griffin, a more recent case from this court, involving a construction site that happened to also be a restriction on access 150 feet to the center of the portion of road there. Then if you turn to the reasonable time, place, and manner restriction cases, so even assuming it's a public forum- Griffin was a case where the road was totally closed for construction, right? That's right. That was a road closure case. Yes, Your Honor. But I don't think it changes the idea that, I mean, the court could have said, well, you did it 150 feet, but I think it should be 100 feet. But the court recognized that that's not the proper role in determining where the nonpublic forum is. And then even if you're in a public forum and you look at the time, place, and manner restrictions, in Burson v. Freeman, for example, the Supreme Court held that 100 foot buffer zone. The difference between 100 foot and a 25 foot was not one that the court was going to engage in in determining whether that was constitutional. But why not? Under the case law, when you balance these rights here, the government has a legitimate right to perform this Border Patrol operation. No question about it. But its extent, as you pointed out, it wouldn't be nearly as defensible if you did what Judge Bates said and move it off several miles. People say, well, why did you do that? Well, there's no justification. But by the same token, where the ropes went, they may be perfectly legitimate. But it seems to me that when you're talking about people wanting to exercise their First Amendment rights to observe where they're placed, whether it's reasonable, is a material issue that the court ought to consider. Well, I mean, the record here is pretty well developed on why the ropes were placed where they were and also why the checkpoint is laid out the way it is. So remember, again, the ropes were placed just at the edge of the checkpoint as it was already designed. And the reason the checkpoint was designed that way was to further significant safety interests. No safety issues have existed long before these ropes were put up. Right, but the ropes were put up only because no one had ever tried to do this before, right? This is a checkpoint on a rural road where people are not naturally going to choose to congregate. So I think it was clear even before the ropes were put up to a member of the traveling public, they're driving down the road. Suddenly, there are cones and equipment all around them. They know that they're in a checkpoint that is not a public sport. No, you're trying to keep them out. The question is, why are you trying to keep them out? And that's a legitimate question, isn't it? And how far away you can place the ropes or whatever the restraining issue is, where people can exercise their constitutional rights and the government can perform its governmental function. That's a legitimate question. But somebody has to decide that, doesn't it? Well, again, I think the checkpoint was already in existence long before these ropes were hung. But there were no ropes there. Right, but the ropes, it was a non-public forum even before the ropes were hung. But let me ask you about that. Does it make a difference? So in Hale, the property was owned by the federal government, which had allowed access. Here, the property is owned by the county, which has given the Border Patrol limited right to develop a checkpoint. With respect to the shoulder property, does that make a difference? Because what's the authority of the Border Patrol to then fence off this shoulder area? It doesn't make a difference for purposes of the First Amendment. I mean, I suppose you could try to make an argument about whether the government has the authority to do that under state or county under the permit that was given to it. But for example, in Greer, the military reservation case, the streets there, the roads there were state and county roads. So they were owned or they had a right of way. I had asked opposing counsel, are the shoulder areas, were they public forums before the Border Patrol came in? Our position is it's fair for the court to assume that they were a public forum because they were a right of way. So we're not disputing, we're not arguing that those were not a right of way. But what we are arguing, as we've already discussed, is that as soon as the checkpoint was established, both the area was, the two prongs were met. The area was dedicated to border security. But you didn't, so we have case law about what the government has to do in order to transform a public forum into a non-public forum. And if we assume that the shoulder areas was a public forum, when the checkpoint came into existence, the government didn't take any steps at that point to rope off that area, which is a necessary in order to demarcate the difference between public and non-public. I don't think rope was necessary to demarcate it. So why is that? Because the, I guess the case law seems to suggest, if it looks like a sidewalk, it's a sidewalk, even if it's before the Supreme Court. You have to make some sort of distinction in it or demarcation. Right, and the Supreme Court cases, I think, perfectly illustrate my point, which is, in Grace, the Supreme Court said the sidewalk is indistinguishable from the rest of the sidewalk, and so that's a public forum. But then in Hodge, the D.C. Circuit said the plaza, which is separated only by a few stairs. It's not separated by a rope or a fence. And in Grace, the Supreme Court distinguished Greer, saying that in Greer, the streets and sidewalks were located inside a military reservation, separated from the streets and sidewalks of the city itself, and that's not true here. And the only way in Greer in which they were separated for purposes of someone driving down the road was sort of a signpost on the side of the road as you drove through it. It wasn't as if you had to go through a gate. And in Hodge, the plaza case, there wasn't a fence or a rope, it was just a couple of stairs. Here, there's... Okay, please go ahead. Sorry, here, even before the ropes were hung up, there was equipment on both sides of the road. If you look at the pictures in the record, I think it shows it very clearly. But not 150 feet out, right? My understanding was it was centered more where the activities are. Well, there's equipment. If you look at the pictures, I think it shows that the equipment does stretch some length, and individual border patrol officers park their cars at various locations on the north side of the road. But the cones and the lane dividers and rumble sticks certainly did stretch out to where the ropes were ultimately hung. So you're saying if I'm a hiker and I'm going down this county right-of-way along this two-lane highway, even though there's nothing obstructing me in the shoulder area, once I see signs on the road, I know I'm entering into a different area. Is that your position? Right, so a hiker's walking down the road. They see signs leading up to the checkpoint saying border patrol checkpoint coming up 500 feet, 200 feet, et cetera. Then they get parallel to traffic dividers, rumble sticks, cones. I think as soon as they are there, parallel to that equipment, they would be on notice that this is not an area devoted to expressive activity, just like someone walking up the stairs to the Supreme Court Plaza would be on notice that this is not the rest of the sidewalk. This is a different location. It doesn't take a fence or a rope to do that. So your position is that from 2007 on, as soon as the government got its permit, put some stuff out there, it became a non-public forum. Nothing else needed, right? That's right, Your Honor. I see that my time is running. Yes, thank you very much, counsel. Appreciate it. Okay, you have a few minutes for rebuttal. Thank you, Your Honor. Just a couple of points, and this goes to Judge Ikuda's question earlier about the state of the factual record. As became clear in that last line of questioning, there are a number of things around this area where law enforcement activity takes place, including signs starting from a long way out. The document that specifies that, which was produced in redacted form, is the traffic control plan referenced by the government. The condition in which the traffic control plan was produced does not allow a fact finder to decide what areas are actually used for law enforcement. For example, at ER 140, there's a section on recommended inspection equipment, which just says the following inspection equipment is recommended depending on local needs, and everything else is a big black box that's redacted. Exactly the same thing is under personnel. That's at ER 141 to 142. There's an introductory sentence, and then a big black box around what the actual details are. So this is the state of the record on the actual use of the property, which, again, is one of the factors that you could look to in deciding whether something has been converted from a public to a non-public forum. There's no detail from which a court or a fact finder could decide what is actually used for law enforcement. I gather your position does not agree with your opposing counsel that in 2007, when this checkpoint was established, that it ipso facto became a public forum, I mean, non-public forum. Absolutely not, Your Honor. Well, what would have to have happened to turn it into a non-public forum? Because the Supreme Court test seems to be you just have to have a demarcation so the public knows that they're entering into a separate area. So, Your Honor, I think that's not the extent of the inquiry because even opposing counsel conceded that the use would have to be legitimate. So there would have to be some legitimate reason for making the exclusion. That, I think, would be an issue in the case where a border patrol erected barriers starting in 2007. But you're not saying that the checkpoint when it was installed in 2007 was for a non-legitimate purpose. Is that right? Correct, Your Honor. So it's a legitimate purpose, but are you saying that there would have to be a justification for all parts of the area and the court should inquire as to whether there was a justification for all parts? Is that your position? I think it's a little bit narrower than that. It's that if there were, in 2007, which is, again, not the facts that we have here and I don't want to get too far into speculating, but if a large area had been set off and there were a policy adopted at that point that pedestrians were excluded, that there would be an obligation on the part of the court to subject that to some scrutiny and determine whether that was done for a legitimate reason. The reason behind that is, of course, that- And the legitimate reason is for the scope, the size of the property? Or you're not doubting that a checkpoint is a legitimate government purpose, right? Not at all, Your Honor. So you're saying there would have, the court would inquire as to whether the size of the area was for a legitimate, was legitimate. Is that what you're saying? Yes, Your Honor. And again, it's viewed through the lens of First Amendment law. It's whether the exclusion of plaintiffs seeking to exercise their First Amendment right to monitor from that very large area was proper. That's right. Okay, but if it ab initio, when the Border Patrol first set aside area and nobody is being excluded, that wouldn't be the question. The question would be, what would the question be as to whether they could put up a huge circus tent if they wanted to over the, I mean, if they had a legitimate government justification, then we wouldn't be looking at exclusion, right? Because there's nobody there at that point asking to monitor the circus activities. So, yes, Your Honor. And your hypothetical has a big assumption in it, which is if there's a legitimate government reason for the exclusion. But we know that the checkpoint, there's a legitimate government interest, right? Because the law enforcement activity. There is, so that I understand this correctly, to my colleague's question. In the question of legitimacy, you can have an enforcement area of, let's say, you know, one by one, whatever. And then you start, they start getting concerned about people wanting to observe. If they expand that to four by four and claim it's all legitimate, that's when the question comes in about whether it's legitimate, right? Your Honor, I think without getting into precise dimensions, I think there's a point at which, and there's certainly a role that the court has to play in examining whether the exclusion from that area is legitimate. Are we looking at legitimacy or motivation? In other words, I'm just trying to understand what the test would be. The opposing counsel says, normally a court doesn't fly spec the government's determination that I need this large an area for law enforcement as opposed to this smaller area. I mean, we normally wouldn't say the crime perimeter has to be this many yards instead of this many yards. So are you saying that because there's a question about the motive for putting up the ropes, that that's what triggers the legitimacy issue? Or what are you saying? They're actually both, Your Honor. And both could be reasons for finding a First Amendment violation. So viewpoint discrimination absolutely is a question that has to be addressed. Narrow tailoring involved as well. Narrow tailoring, well, narrow tailoring would apply to if there were some sort of content-based discrimination, for example. Use loosely, you know, narrow tailoring, there has to be some evaluation. And even if you look at a case, for example, the case involving the highway overpass and signs hung from it, and this was undisputedly a non-public forum, the court even there looked at the reasonableness and the relationship between the restriction and signs. So that would justify, I mean, the narrow tailoring would be to justify a content-based regulation. But we don't, I mean, I don't think we're at that point yet. Is that right? I mean, your position is that there was viewpoint, or there's a genuine issue of material fact as to whether there was viewpoint discrimination. That is one of the principal fact issues. That's right, Your Honor. Okay, any other questions by my colleagues? Thank you both. Counsel, you were very, very helpful. The case just argued is submitted, and the court stands adjourned for the day.
judges: M. Smith, Ikuta, Bates